## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ICOM NORTH AMERICA, LLC,**
a Delaware limited liability company,

      Plaintiff,

v.

**THE ED RACHAL FOUNDATION,**
a Texas corporation, and
**FIDELIS CAPITAL, LLC,**
an Alabama limited liability company,

      Defendants.

Case No.
Hon.

---

## VERIFIED COMPLAINT FOR *EX PARTE* TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND OTHER REMEDIES

Plaintiff ICOM North America, LLC, by its counsel, Butzel Long, states the following for its Verified Complaint For *Ex Parte* Temporary Restraining Order, Injunctive Relief, and Other Remedies against Defendants, The Ed Rachal Foundation, and Fidelis Capital, LLC:

### PRELIMINARY STATEMENT AND NATURE OF THE CASE

1.     Emergency and immediate relief is critical because Defendants are on the verge of selling Plaintiff ICOM North America, LLC's ("ICOM") highly confidential trade secrets to an unknown third party (or parties).

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

2.     The underlying facts, provided in depth below, boil down to the following:  ICOM manufactures and sells highly sophisticated liquid propane fuel injection systems;  ICOM is the owner of the technology used in the design of the systems;  several years ago, ICOM contracted with CleanFuel USA, Inc. ("CleanFuel") for it to sell and distribute the ICOM injection systems; CleanFuel was bound by a strict non-disclosure, non-use, and confidentiality agreement; in breach of that agreement, CleanFuel subsequently misappropriated ICOM's trade secrets.   ICOM brought two separate actions against CleanFuel;  the first was settled with CleanFuel agreeing to pay ICOM royalties for use of ICOM's trade secrets used in the 6.0L system; the latter action has been thwarted by CleanFuel, including the filing of a Bankruptcy petition and the turnover of ICOM's trade secrets to CleanFuel's lender.

3.     During the period of its contract with ICOM, CleanFuel pledged its assets as collateral to its lender, Defendant The Ed Rachal Foundation ("Foundation").   CleanFuel subsequently defaulted on its indebtedness to the Foundation, and the Foundation in turn has now foreclosed on the collateral. Through the foreclosure, the Foundation has taken actual or constructive possession of ICOM's trade secrets.   Nothing gave the Foundation a right to take possession of ICOM's trade secrets, yet the Foundation has just announced its

2

plans to "sell or license" the collateral, including ICOM's trade secrets in a private sale "sometime after October 21, 2016."

4.     Events over the past several years show without a doubt that ICOM is the owner of the trade secrets, as stated in greater detail below: (i) in a series of distributor agreements between CleanFuel and ICOM, it is acknowledged that ICOM is the developer and owner of the trade secrets; (ii) a 2012 Agreement gave CleanFuel a license to use ICOM's trade secrets for a 6.0L system conditioned on CleanFuel paying ICOM a royalty for each system sold; (iii) CleanFuel has paid ICOM royalties on 6.0L systems sold; (iv) on its website, CleanFuel acknowledges its use of ICOM's trade secrets for each of its 6.0L systems; (v) the 2012 Agreement prohibits CleanFuel from using ICOM's trade secrets on any other systems; (vi) during a press announcement CleanFuel's president acknowledged CleanFuel's use of ICOM's trade secrets on CleanFuel's 8.0L system; and (vii) CleanFuel's Vice President and current shareholder admitted in a sworn affidavit that CleanFuel used ICOM's trade secrets in the development of CleanFuel's system.

5.     CleanFuel's breach of the 2012 Agreement and misappropriation of ICOM's trade secret was, until recently, the subject of an arbitration pending before the Hon. (Ret.) Steven Crane, JAMS, New York, New York.  Several orders adverse to CleanFuel were issued.

6.      Recognizing that CleanFuel would lose in arbitration because CleanFuel had misappropriated ICOM's technology, neither the Foundation nor CleanFuel wanted the arbitration to move forward.   One week prior to the scheduled arbitration hearing, CleanFuel filed for chapter 11 bankruptcy protection in the United States District Bankruptcy Court, Western District of Texas, Austin Division ("Bankruptcy Court").

7.      ICOM moved to lift the stay to proceed with the arbitration.   Both CleanFuel and the Foundation opposed the motion.   The Bankruptcy Court, however, lifted the automatic stay permitting the arbitration to proceed.   The arbitration was rescheduled for October 24, 2016.

8.      The Foundation, however, had no intention of permitting CleanFuel to appear for arbitration.   On August 23, 2016, the Foundation filed a motion with the Bankruptcy Court to lift the stay on its right to foreclose on CleanFuel's collateral.

9.      Against ICOM's objection and request to allow the arbitration to move forward first, the Bankruptcy Court lifted the stay, allowing the Foundation to foreclose on CleanFuel's collateral on or around October 10, 2016.   The Foundation denies that CleanFuel's systems utilize ICOM's trade secrets and in its foreclosure on the collateral it has improperly taken actual or constructive possession of ICOM's trade secrets.

10.    On October 13, 2016, ICOM received notice that the Foundation intends to "sell or license" the collateral in a private sale sometime after October 21, 2016.   ICOM understands that the Foundation intends to sell or license ICOM's trade secrets.

11.    The Foundation claims that CleanFuel owes it $16 million dollars and nearly all of the value of CleanFuel's alleged assets is actually ICOM's trade secrets.   Consequently, the Foundation's only hope of recovery is by selling or licensing that which it does not own (i.e., ICOM's Trade Secrets).   If this private sale or license proceeds, ICOM will be irreparably harmed because its trade secrets will be in the hands of a competitor.

## PARTIES AND VENUE

12.    Plaintiff ICOM is a Delaware limited liability company with its principal place of business located in New Hudson, Michigan.   ICOM is the owner of a proprietary liquid propane fuel injection technology ("ICOM's Trade Secrets" or the "Trade Secrets").   ICOM licensed its Trade Secrets to CleanFuel USA, Inc. ("CleanFuel") solely for use in a 6.0L vehicle engine.

13.    Defendant Foundation is a Texas non-profit corporation that provided funding to CleanFuel and took a security interest in all of CleanFuel's Assets, as defined below.   CleanFuel's liquid injection manufacturing and assembly facility is located at 29387 Lorie Lane, Wixom, Michigan.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

14.   Defendant Fidelis Capital, LLC ("Fidelis") is an Alabama limited liability company with headquarters at 3104 Blue Lake Dr., Vestavia Hills, Alabama.

15.   On or around October 10, 2016, the Foundation and its administrative agent, Defendant Fidelis, took possession and/or constructive possession of all CleanFuel's Assets.  In doing so, it took and caused the wrongful possession of ICOM's Trade Secrets, including those located at CleanFuel's facilities located in Wixom, Michigan and Georgetown, Texas.  The Foundation and Fidelis shall hereafter be referred to jointly as "Defendants."

16.   This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); and 28 U.S.C. § 1367 (supplemental jurisdiction).

17.   Personal jurisdiction over Defendants in this Court is proper because Defendants did or caused an act to be done, or consequences to occur, in this state resulting in an action for tort; and Defendants committed and threaten to commit tortious and other wrongful acts directed towards, and having an impact upon, the State of Michigan and residents thereof, including Plaintiff.

18.   Venue is proper in this District under 28 U.S.C. § 1391.

## **Factual Background**

19.    ICOM is the owner of, and holds all rights to, the ICOM Trade Secrets.  The ICOM Trade Secrets consists of, among other things, proprietary engineering concepts, designs, methodologies, processes, and testing results, and other proprietary know-how that is used by ICOM in its liquid propane fuel injection system ("ICOM System").  The ICOM Trade Secrets that are in dispute in this litigation are identified on **Exhibit 1.**

20.    The ICOM System is an innovative, reliable, durable, and low maintenance system that allows vehicles to run on propane gas, a relatively cheap and ecologically friendly fuel.  Unlike other alternative propane fuel systems that deliver propane in vapor form, ICOM's system delivers liquid propane.  The ICOM System's base technology is used by ICOM on a variety of engine platforms.

21.    ICOM sells the ICOM System, generally, to fleet vehicle operators, such as UPS, FedEx, Metro Cars, municipal police departments, retailers, and the like.  The ICOM System converts the original vehicle manufacturer's traditional gasoline fuel injection system to a liquid injection propane system.

22.    ICOM is recognized as a leader in the development and manufacturing of liquid propane injection systems and it maintains a competitive edge through its proprietary Trade Secrets.

## CleanFuel and ICOM's Contractual Relationship

### The 2004 Agreement

23.    In 2004, ICOM and CleanFuel entered into an agreement to join forces to introduce a 8.1L propane fuel injection system to the marketplace ("2004 Agreement," attached hereto as **Exhibit 2**).  The 2004 Agreement makes clear that ICOM was the developer and sole owner of the technology.  CleanFuel's only role was to obtain the necessary regulatory certifications and to sell and distribute the 8.1L and 6.0L systems. *Id.* **at ¶¶** 1 and 4.

24.    In order to perform under the 2004 Agreement, CleanFuel required access to the ICOM Trade Secrets.  All of the Trade Secrets information that ICOM provided to CleanFuel was protected under the 2004 Agreement's confidentiality provision.  *Id.* ¶ 24.

25.    ICOM, at all times, took sufficient and reasonable steps to maintain the secrecy and confidentiality of its Trade Secrets.

### The 2006 Agreement

26.    In the late summer of 2006, ICOM and CleanFuel modified their contractual relationship.   On September 8, 2006 they executed a second Distribution Agreement (hereinafter the "2006 Agreement," attached as **Exhibit 3**).  As with the 2004 Agreement, CleanFuel was responsible for procuring the required regulatory emission standard certifications from the EPA and CARB. *Id.*

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

at ¶¶ 1(a)(ii), 4(d), 4(g)-(i) & 4(o)-(p).  CleanFuel also was responsible for selling and distributing the system.  CleanFuel was expressly precluded from distributing, producing, and certifying any other liquid propane fuel system.  2006 Agreement, ¶¶ 1(a)(i).

27.   As part of the emission certification process, CleanFuel observed ICOM's design and validation testing and was provided office space in ICOM's manufacturing, development, and testing facility where it had access to ICOM know-how, methodologies, testing results, and engineering drawings.

28.   ICOM was diligent in taking reasonable precautionary steps to protect its proprietary information.  The 2006 Agreement included the following confidentiality, non-disclosure, and non-use provision:

> [D]uring the term of this Agreement the parties will be providing each other with confidential, proprietary, or trade secret information, whether or not such information is reduced in writing ("Confidential Information").  Company and Distributor hereby agree that they will not, at any time during or after the term of this Agreement for any reason whatsoever, unless compelled to do so by law (in which event said party must immediately provide Notice of same to the other party), divulge, disclose or communicate Confidential information, in any manner or to any extent to any person or entity not expressly authorized by the other party to receive such information.  Neither Company nor Distributor will use or permit the use of any such information, except with the express written consent and for the benefit of the other party.  The term Confidential Information may include and/or pertain to, among other things, designs, methods, systems, plans, procedures, practices, devices, manufacturing techniques, manufacturing processes, computer hardware, computer software, computer databases, computer programs, marketing plans, costs, sales, prices,

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

quotations, bids, operations, . . . as well as . . . the identities, . . . of current or prospective customers or suppliers of each party to this Agreement.

*Id.* at ¶ 25.

29.    Additionally, ICOM takes the following reasonable precautionary steps, among others, to protect its proprietary information: password protection on its computers; restricted access to its facilities; confidentiality and non-disclosure agreements with employees, contractors, vendors, distributors, and anyone else who comes in contact with their Trade Secrets; and strict prohibitions on disclosing any confidential information.

30.    During the term of the 2006 Agreement, ICOM discovered that CleanFuel was using its Trade Secrets to develop a competing liquid injection propane system.

31.    ICOM sued CleanFuel for breach of contract and misappropriation of ICOM's trade secrets.  Pursuant to the parties' contractual arbitration provision, the litigation was filed with JAMS Arbitration, New York (hereinafter the "First Arbitration").  *Id.* at ¶ 21.

**The 2010 Agreement**

32.    On January 21, 2010, the parties settled the First Arbitration (hereinafter "2010 Agreement," attached hereto as **Exhibit 4**).

33.   In the 2010 Agreement, CleanFuel agreed that the technology on 6.0L system and 8.1L systems was ICOM's technology and that it was developed by ICOM. *Id.* at ¶¶ 2 & 18.

34.   CleanFuel also agreed to acknowledge ICOM's ownership of the technology:

> [i]n all marketing and advertising materials and presentations for the GM 6.0, 8.1 and Blue Bird systems, including press releases, news articles, and presentations, and on CF's website(s) . . . .

And also to

> activate a campaign that touts ICOM as the system manufacturer and technology provider in a conspicuous and prominent manner in no less than 3 articles in appropriate national industry sector venues and in 3 CF Press Releases starting immediately and to be concluded by March 31, 2010.

*Id.* at intro & ¶¶ 16 & 31.

35.   CleanFuel also agreed that nothing in the 2010 Agreement transferred or assigned ICOM's proprietary information to CleanFuel. *Id.* at intro & ¶¶ 16 & 31.

36.   CleanFuel's confidentiality obligations under the 2006 Distribution Agreement remained. *Id.* at intro & ¶¶ 16 & 31.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

**The 2012 Agreement**

37.     Within a short period of time after executing the 2010 Agreement, ICOM learned that CleanFuel had breached the 2010 Agreement and was marketing a 6.0L system.

38.     A new JAMs arbitration proceeding was commenced wherein ICOM again brought claims against CleanFuel for misappropriating ICOM's proprietary information and for breach of the contractual confidentiality and non-use obligations (the "Second Arbitration").

39.     On July 12, 2012, CleanFuel and ICOM settled the Second Arbitration. (See "2012 Agreement," attached as **Exhibit 5**).

40.     The following terms of the 2012 Agreement are relevant to this dispute:

a)     CleanFuel acknowledged in the 2012 Agreement that the technology that it uses in its 6.0L system is ICOM's Trade Secrets and it agreed that it would inform the public that its 6.0L system utilizes ICOM's proprietary technology. *Id.*

b)     CleanFuel agreed to pay ICOM a royalty for the use of ICOM's Trade Secrets.   For every 6.0L system that CleanFuel sold, distributed, or brokered by or on behalf of CleanFuel or its affiliates, CleanFuel was required to pay ICOM a royalty. *Id.* at ¶ 2.

c)     CleanFuel agreed to pay ICOM a royalty for each 6.0L system sold through 2017.  For the years 2016 and 2017, CleanFuel is required to pay ICOM a royalty of $750 for each 6.0L system.  *Id.* at ¶ 2(d)-(e).  Interest on any late payments "accrues at a rate of 9% annum." *Id.* at ¶ 2(e).

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

d)   The 2012 Agreement incorporated the 2006 Agreement's confidentiality, non-use, and non-disclosure obligations, carrying those obligations forward. *Id.* at ¶ 3 and Exhibit A to the 2012 Agreement, at p. 1.

e)   The 2012 Agreement expressly precluded CleanFuel from using ICOM's technology on other engine platforms. *Id.*, ¶¶ 5(a), 5(b), 3 and Exhibit A to the 2012 Agreement, p. 1.

**CleanFuel's Breach of the 2012 Agreement**

41.   In 2013, ICOM discovered that CleanFuel had again misappropriated its Trade Secrets and used it to develop an 8.0L liquid propane injection system.

42.   In July of 2013, ICOM again commenced arbitration (the "Third Arbitration"), asserting claims of breach of the 2012 Agreement's confidentiality provision and misappropriation of trade secret information under the Delaware Uniform Trade Secret Act ("DUTSA"). The specific trade secrets used by CleanFuel in its 8.0L system are the Trade Secrets identified earlier in this Complaint.

43.   During the course of the Third Arbitration, CleanFuel committed other breaches of the 2012 Agreement by: (i) failing to make royalty payments; (ii) taking a required website technology disclosure off of CleanFuel's 6.0L vehicle webpages; (iii) refusing to allow ICOM to audit sales and other records; and (iv) failing to pay for the audit when the audit uncovered that CleanFuel had not reported sales nor paid ICOM the royalties owed on numerous 6.0lL vehicle sales.

As of February 2016, CleanFuel had failed to report the sale of one-hundred and seventy (170) 6.0L systems to ICOM.

44.     During the Third Arbitration, the Arbitrator issued several adverse orders against CleanFuel for its failure to produce discovery as ordered and for corruption of critical meta-data.  CleanFuel never identified an expert nor filed an expert report as required under the scheduling order.

45.     CleanFuel has, in fact, admitted that the technology that it uses on its 6.0L system is ICOM's proprietary Trade Secrets.  For the past 4 years through to the present, CleanFuel's website acknowledges that its 6.0L System uses ICOM Trade Secrets.  **Exhibit 6**.

46.     While in the process of developing their 8.0L system, CleanFuel's then CEO, Tucker Perkins, informed the press that CleanFuel's 8.0L System was being developed using ICOM's Trade Secrets.  **Exhibit 7**.

47.     ICOM has also been able to procure the sworn affidavit of a CleanFuel Vice President and engineer, who is still a shareholder of CleanFuel, who admitted that CleanFuel used ICOM's technology and trade secrets in creating CleanFuel's fuel injection system.  **Exhibit 8.**

**The Bankruptcy Filing and the Foundation**

48.     After many delays by CleanFuel, the Arbitration hearing was finally scheduled to take place on April 11, 2016.  Knowing that it would be found in

14

breach of contract because it was using ICOM's Trade Secrets without paying the royalties owed on the 6.0L system and knowing that it would be found to have misappropriated ICOM's Trade Secrets on its 8.0L system, CleanFuel filed for bankruptcy protection in the United States Bankruptcy Court for the Western District of Texas, Austin Division, on April 3, 2016.

49.    The Third Arbitration was immediately automatically stayed.

50.    The Foundation is a lender/investor in CleanFuel.  Over the past several years it has loaned somewhere in the neighborhood of $16 million dollars (including interest) to CleanFuel.

51.    The Foundation claims to have a security interest in

[a]ll right, title, interest, claims and demands of CleanFuel in and to each and every asset, tangible and intangible, in which Debtor has any right, title, interest, claim or demand, including, without limitation accounts receivable, inventory, equipment, personal property, patents, trademarks, copyrights, trade secrets, confidential information and any other proprietary or Trade Secrets rights, together with all substitutions, proceeds, renewals, replacements of and additions, improvements, replacement parts and accumulations to any and all of such assets, except that collateral which was subject to a Lien in favor of a third party (hereinafter the "Collateral").

52.    On April 22, 2016, ICOM filed a motion to lift the automatic stay and, on June 16, 2016, ICOM's motion was granted on the condition that the parties and the Foundation mediate the dispute.

53.    ICOM, CleanFuel and Foundation mediated the dispute, but were unsuccessful in resolving the matter.

54.     The Arbitration hearing was rescheduled for October 24, 2016.

55.     The Foundation, like CleanFuel, did not want the Arbitration to go forward.

56.     On August 23, 2016, the Foundation filed a motion with the Bankruptcy Court seeking to lift the stay to allow it to move forward to foreclose upon the CleanFuel Collateral in which it claims to have an interest.   The Bankruptcy Court granted the motion and the stay was lifted on September 20, 2016.

57.     ICOM argued that its Trade Secrets should be removed from the Collateral at that point, but the Bankruptcy Court declined to hear the argument and noted that such a request was for another court (i.e., this Court) to decide.

**The Foundation's Improper Acquisition and Threatened Disclosure of ICOM's Trade Secrets**

58.     On or about September 30, 2016, ICOM gave written notice to the Foundation that ICOM's Trade Secrets were being wrongfully held by CleanFuel and that any sale or other disposition by the Foundation of ICOM's Trade Secrets would be wrongful.   ICOM's Counsel provided that written notice to the Foundation's counsel on or about October 4, 2016.   **Exhibit 9**.  Despite that notice, on or around October 10, 2016, the Foundation took actual and/or constructive possession of the Collateral.   In doing so, on or around October 10, 2016, the Foundation also wrongly took possession of and improperly acquired ICOM's

Trade Secrets. The Foundation has no right—contractual or otherwise—to ICOM's Trade Secrets.

59.     On October 13, 2016, ICOM received notice, in a letter dated October 10, 2016, that the Foundation and its administrative agent, Fidelis, would "sell or license the collateral" "privately sometime after October 21, 2016." **Exhibit 10**.

60.     ICOM has subsequently obtained information leading it to believe that CleanFuel may be planning to move ICOM's Trade Secrets to Mexico, making it much harder for ICOM to retrieve and protect its Trade Secrets.

61.     On October 18 and again on October 19, 2016, ICOM, through its counsel, sent another letter to the Foundation and Fidelis, through their counsel, Waller, Lansden, Dortch, and Davis, LLP and Wood, Boykin & Wolter P.C., re-notifying them of ICOM's claim to its Trade Secrets and requesting that they immediately acknowledge no right to ownership or possession of the Trade Secrets, and demanding that they immediately turn over the Trade Secrets, as well as all 6.0L components and systems. **Exhibit 11**.

62.     The Foundation and Fidelis have refused to return ICOM's Trade Secrets back to ICOM and are threatening to further misappropriate and disclose the Trade Secrets.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

63.     The Foundation and Fidelis intend to wrongfully sell ICOM's Trade Secrets in a "private sale" to take place "sometime after October 21, 2016."

64.     As a direct consequence of Defendants' actions, ICOM stands to lose its Trade Secrets (and the inherent value of them due to their secrecy) and potentially its entire business, including the loss of employees, clients and customers, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained.

65.     Among other things, if Defendants are not immediately barred from selling, transferring, using, moving, or otherwise disclosing, dispersing, or disseminating ICOM's Trade Secrets, ICOM will continue to suffer irreparable harm.

66.     ICOM lacks an adequate remedy at law to address the substantial and irreparable harm it is suffering as a result of Defendants' actions.

## COUNT I
## VIOLATION OF THE
## DEFEND TRADE SECRETS ACT OF 2016

67.     Plaintiff incorporates the preceding paragraphs by reference as if fully stated here.

68.     On or around October 10, 2016, Defendants improperly acquired ICOM's Trade Secrets knowing or with reason to know that the Trade Secrets were acquired by improper means or that they were acquired under circumstances

18

giving rise to a duty to maintain the secrecy of the Trade Secrets or were derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret.

69.     Defendants have threatened, conceded, and announced their intent to disclose ICOM's Trade Secrets without the express or implied consent of ICOM, despite the fact that they knew that the Trade Secrets were derived using improper means, were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets, or were derived from a person who owed a duty to ICOM to maintain the secrecy of the Trade Secrets.

70.     This improper and threatened disclosure will take place as soon as October 22, 2016 if Defendants are not enjoined from doing so.

71.     Defendants do not have consent to disclose ICOM's Trade Secrets, have wrongfully used the Trade Secrets, and have used improper means to acquire the Trade Secrets.

72.     Defendants' wrongful withholding and use of the Trade Secrets continues.

73.     Moreover, Defendants threaten (in fact, promise) to further disclose, misappropriate, and sell the Trade Secrets, if not enjoined by this Court.

74.     The Trade Secrets include, but are not limited to, technical information, including engineering designs, drawings, and manufacturing testing

19

processes where considerable time, effort, and money went into their development and considerable efforts have been undertaken by ICOM to ensure that the Trade Secrets are kept secret and are not generally known to the public.

75.     The Trade Secrets derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

76.     The Trade Secrets are used in a product that is intended for use in, and is used in, interstate and foreign commerce.

77.     Defendants, knowingly, by improper means and without authorization, as described above, acquired and continue to exercise dominion and control over the Trade Secrets, in violation of DTSA, and threaten to further disclose or misappropriate those Trade Secrets.

78.     Defendants knowingly are offering for sale the Trade Secrets without the consent or authorization of ICOM.

79.     Defendants' misappropriation is willful and malicious.

80.     As a result of Defendants' misappropriation, Plaintiff has suffered and will continue to suffer damages and irreparable harm.

81.     As a result of Defendants' misappropriation, Plaintiff is entitled to all such relief as is available under the DTSA.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

82.     Plaintiff also seeks monetary damages, recovery of the amount that the Defendants have been unjustly enriched, forensic and other costs, injunctive relief, treble damages, and attorney's fees and costs, along with any and all other relief afforded to them under the DTSA or that this Court deems reasonable.

## COUNT II
## VIOLATION OF THE MICHIGAN
## UNIFORM TRADE SECRET ACT

83.     Plaintiff incorporates the preceding paragraphs by reference as if fully stated here.

84.     ICOM's Trade Secrets are subject to protection under the Michigan Uniform Trade Secrets Act (MUTSA), M.C.L. § 445.1901 *et seq.*

85.     Considerable time, effort, and money went into the development of the Trade Secrets, and considerable efforts have been undertaken to ensure that these Trade Secrets are kept secret and are not generally known to the public.

86.     The Trade Secrets derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from, their disclosure or use.

87.     Defendants, knowingly, by improper means and without authorization, as described above, acquired and continue to exercise dominion and control over the Trade Secrets, in violation of MUTSA.

88.    Defendants knowingly are offering for sale the Trade Secrets without the consent or authorization of ICOM.

89.    Defendants' misappropriation is willful and malicious.

90.    As a result of Defendants' misappropriation, Plaintiff has suffered and will continue to suffer damages and irreparable harm.

91.    As a result of Defendants' misappropriation, Plaintiff is entitled to all such relief as is available under MUTSA and at common law, including monetary damages, injunctive relief, forensic and other costs, and award of attorney's fees and costs pursuant to M.C.L. § 445.1905.

## COUNT III
## PRELIMINARY INJUNCTIVE RELIEF
## AND PERMANENT INJUNCTIVE RELIEF

92.    Plaintiff incorporates the preceding paragraphs by reference as if fully stated here.

93.    Defendant has committed trade secret misappropriation, in violation of MUTSA and DTSA, and conversion, as described herein.

94.    Plaintiff has suffered irreparable harm that cannot be remedied by money damages as a result of Defendants' wrongful conduct, and will continue to suffer such harm as long as Defendants are in possession and/or constructive possession and control of the aforementioned Trade Secrets.

95.     Based on the foregoing, especially **in** light of Defendants' stated intent to sell the Trade Secrets in a private sale so that ICOM will have no knowledge of the whereabouts of its Trade Secrets until they are being used competitively against it, ICOM is entitled to preliminary injunctive relief, on an ex parte basis, and permanent injunctive relief, and are entitled to an Order that, among other things, orders that:

    a.  Defendants The Ed Rachal Foundation and Fidelis Capital, LLC are hereby enjoined from, directly or indirectly, selling, transferring, disseminating, disclosing, and/or otherwise misappropriating ICOM's Trade Secrets to any party or person whatsoever;

    b.  Defendants The Ed Rachal Foundation and Fidelis Capital, LLC are hereby ordered to immediately return to ICOM all of ICOM's trade secrets in any format (electronic, hard copy, or otherwise), including, but not limited to, engineering drawings, CAD drawings, manufacturing processing, and any other documents or programs that contain ICOM's trade secrets; and

    c.  Any and all other relief, equitable or legal in nature, that this Court deems appropriate, in addition to any and all monetary damages that ICOM may further be entitled to.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

Dated:  October 19, 2016

Respectfully submitted,

BUTZEL LONG

By: /s/ Cynthia J. Haffey
Cynthia J. Haffey (P57352)
Bernard Fuhs (P69621)
Paul Mersino (P72719)
150 W. Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
***Counsel to ICOM North America, LLC***

24

## VERIFICATION OF RALPH PERPETUINI

STATE OF MICHIGAN      )
                             ) ss
COUNTY OF OAKLAND     )

I, Mr. Ralph Perpetuini, Chief Executive Officer of ICOM North America, LLC, having first been duly sworn, depose and state that I am an officer of Plaintiff ICOM; that I have read the foregoing Verified Complaint and know its content; and that the statements of fact set forth in the above Verified Complaint are true and accurate, except as to matters therein stated to be on information and belief, and as to those matters that I believe the same to be true to the best of my knowledge and belief.

**ICOM NORTH AMERICA, LLC**

By: _____
Mr. Ralph Perpetuini
Its: Chief Executive Officer

Subscribed and sworn to before me
this 19th day of October, 2016

_____

CRAIG R JANES
Notary Public - Michigan
Oakland County
My Commission Expires Jun 7, 2019
Acting in the County of Oakland

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS